BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, National Security Division
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
1500/1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone:     (213) 894-3667/0762
Facsimile:     (213) 894-0141
E-mail:   Ian.Yanniello@usdoj.gov
          Haoxiaohan.Cai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 24-236-SPG(A)-1 |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT JASVEEN SANGHA; EXHIBITS A-D (EXHIBITS A AND D CONCURRENTLY FILED UNDER SEAL) |
| v. | |
| JASVEEN SANGHA, aka "Ketamine Queen," | |
| Defendant. | |

        Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Ian V. Yanniello and Haoxiaohan Cai, hereby files its Sentencing Position Regarding Defendant Jasveen Sangha.

//

//

This position is based upon the attached memorandum of points and authorities, the files and records in this case, the exhibits attached here to, including Exhibit A, which contains a Los Angeles Police Department Report of a Death Investigation for Victim Cody McLaury and the Autopsy Report of Cody McLaury, Exhibit B, which is a screenshot of a message defendant received on her cellphone with redactions, Exhibit C, which is an internet search preserved from defendant's cellphone, and Exhibit D, excerpted texts   between defendant and Victim McLaury, and such further evidence and argument as the Court may permit.

Concurrent with this filing, the government is moving to seal Exhibits A and D.

Dated: March 25, 2026

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division


_____/s/_____
IAN V. YANNIELLO
HAOXIAOHAN CAI
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE


TABLE OF AUTHORITIES.................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION...................................................1

II.   DEFENDANT'S PLEA AGREEMENT AND RELEVANT FACTUAL BACKGROUND.....2

      A.    The Plea Agreement.......................................2

      B.    For Years, Defendant Was a High-Volume Dealer Who Used
            Her North Hollywood Residence to Store, Manufacture,
            and Sell Drugs...........................................3

      C.    Defendant Sold Ketamine to Cody McLaury the Day He
            Died of a Drug Overdose..................................4

      D.    Defendant Continued to Sell Drugs After Being Warned
            That Her Drugs Contributed to Victim McLaury's Death.....5

      E.    Defendant Worked With Co-Conspirator Fleming to
            Distribute Ketamine to Matthew Perry, Resulting in Mr.
            Perry's Death............................................6

      A.    Defendant and Co-Conspirator Fleming Sold 50
            Additional Ketamine Vials to Mr. Perry...................7

      B.    Defendant Directs Co-Conspirator Fleming to Delete
            Evidence After Learning About Mr. Perry's Death..........8

III.  SENTENCING GUIDELINES CALCULATION.............................9

      A.    The Government Agrees with the USPO's Calculations.......9

      B.    The Court Should Overrule Defendant's Objections.........9

            1.    The Stash House Enhancement Applies (Def. Obj. 1)....9

            2.    Defendant Played An Aggravating Role (Def. Obj.
                  2.)..............................................10

            3.    Defendant Obstructed Justice (Def. Obj. 3.).........13

            4.    Defendant Is Not a Zero Point Offender Because
                  Her Offense Conduct Caused Death and She Was a
                  Leader/Organizer of the Drug Trafficking Scheme
                  (Def. Obj. 6.)...................................14

IV.   A 180-MONTH SENTENCE IS JUST AND APPROPRIATE GIVEN THE

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

     AGGRAVATING CIRCUMSTANCES IN THIS CASE........................15

     A.    Defendant Trafficked Drugs In Bulk for Many Years and Used Others to Help Facilitate her Trafficking...........15

     B.    Defendant repeatedly sold drugs after learning she contributed to at least two deaths.......................16

     C.    Defendant's Criminal History Category Fails to Account for Her History of Crime................................17

     D.    Defendant Sold Drugs for Greed and Notoriety.............18

     E.    A Significant Term of Imprisonment Is Necessary to Provide Just Punishment and Avoid Sentencing Disparities..............................................19

V.    CONCLUSION...................................................19

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

Cases

United States v. Tekola,
    2026 WL 654548 (9th Cir. Mar. 9, 2026) ............................ 10

United States v. Doe,
    778 F.3d 814 (9th Cir. 2015) ..................................... 12

United States v. Kealoha,
    2024 WL 1202377 (D. Haw. Mar. 19, 2024) ......................... 15

United States v. Morales,
    680 F. App'x 548 (9th Cir. 2017) ................................ 10

Statutes

18 U.S.C. § 856.................................................... 9

18 U.S.C. § 3553(a)......................................... 2, 15, 18

21 U.S.C. § 856................................................... 10

21 U.S.C. § 856(a)(1)............................................. 2

21 U.S.C. §§ 841(a)(1)............................................ 2

U.S.C. § 856..................................................... 10

Rules

U.S.S.G. § 3B1.1(c)............................................... 9

U.S.S.G. § 3C1.1.......................................... 9, 13, 14

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

**I.    INTRODUCTION**

This case is about a drug dealer who sold drugs that hurt people.  For years, defendant Jasveen Sangha operated a high-volume drug trafficking business out of her North Hollywood residence.  From that location, she manufactured drugs, packaged drugs, stored drugs, and repeatedly sold her drugs until her arrest in March 2024.  To cultivate her business, defendant marketed herself as an exclusive dealer who catered to high-profile Hollywood clientele.  As she told one customer in 2020, "I'm really select with people," and "it's a very VIP circle of celebs," whom she also described as "[r]ed carpet motherfuckers."  (PSR ¶ 32.)

While defendant worked to expand and profit from her drug trafficking, she knew --- and disregarded --- the grave harm her conduct was causing.  No later than 2020, after defendant learned her ketamine contributed to the overdose death of Cody McLaury, she was on clear notice that she was distributing dangerous and deadly drugs. A member of Mr. McLaury's family contacted defendant directly and told her, "The ketamine you sold [McLaury] killed him. It's listed as the cause of death."  In response, defendant searched online, "can ketamine be listed as a cause of death"?

But knowledge of that danger did not slow --- much less stop --- defendant's desire for profit, status, and more sales.  As a result, defendant's drugs caused the death of a least one more victim: Matthew Perry in October 2023. Unfortunately, just like Mr. McLaury's death, Mr. Perry's death did not alter defendant's illegal conduct. To the contrary, she sprung into action to cover her tracks and distance herself from the chain of events that killed Mr. Perry.  She

directed a co-conspirator to "[d]elete all of our text messages" about Mr. Perry, and continued selling drugs until law enforcement searched her stash house and found significant quantities of methamphetamine pills, ketamine, cocaine, and other drugs.

For the reasons set forth below --- including the far reaching scope of defendant's illegality, her callous response to the deaths she helped cause, and her attempt to obstruct justice --- the government submits that a sentence of 180 months' imprisonment is necessary, just, and appropriate to adequate to account for defendant's crimes and satisfy the sentencing goals of 18 U.S.C. § 3553(a).

**II.   DEFENDANT'S PLEA AGREEMENT AND RELEVANT FACTUAL BACKGROUND**

**A.   The Plea Agreement**

Pursuant to a plea agreement, defendant pled guilty to Counts Two, Three, Eleven, Twelve, and Thirteen of the First Superseding Indictment, namely, maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count Two), distribution of ketamine to Victim C.M., in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i) (Count Three), distribution of ketamine to Matthew Perry (Counts Eleven and Twelve), and distribution of ketamine resulting in death and serious bodily injury to Mr. Perry, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i) (Count Thirteen).  (See Dkt. 85 [Plea Agreement]; 87 [Minutes].)  The plea agreement did not contain any agreement regarding defendant's Guidelines range nor defendant's criminal history.  (See Dkt. 85 at ¶ 21.)

**B.    For Years, Defendant Was a High-Volume Dealer Who Used Her North Hollywood Residence to Store, Manufacture, and Sell Drugs**

As defendant admitted in her plea agreement, since at least June 14, 2019, defendant used her North Hollywood residence to store, package, and distribute drugs, including ketamine and methamphetamine.  Among other things, defendant would solicit drug customers to buy drugs and to pick the drugs up from her North Hollywood residence.  Defendant would also tell her customers to deposit money into and/or retrieve drugs from a lockbox she maintained outside of her residence.  For example, on October 31, 2020, a drug customer contacted defendant by text and requested to purchase 6 bottles of liquid ketamine.  In response, defendant advised she was running low on ketamine she sold in orange capped vials, and would "have to prob throw in a blue cap of [sic] too if I don't have it all ready."  Defendant then said she would include two ecstasy pills, and confirmed the drugs would be placed in her "lockbox" after giving her customer the code to open it.

As set forth in the PSR, evidence shows that defendant used at least two co-conspirators, Individual 1 and Individual 2,[1] to distribute her drugs during the relevant period.  (PSR ¶ 29.)  For example, on January 8, 2021, defendant texted Individual 1, "Can u leave one in lockbox for [a customer] the clear," and on August 30, 2021, "Ok [a customer] will grab them from you tomorrow … finding out what time and then I told him to dial 999"; and "I'll tell him if

---

[1] The FSI identifies Individual 1 as an uncharged co-conspirator, and defendant identifies Individual 1 as a former roommate and Individual 2 as a former boyfriend in her objections to the PSR.  Dkt. 101 at 3.

3

there's a box there just to use that code and leave cash in there." (PSR ¶ 30.)  Another example is on March 13, 2024, defendant sent a group text message stating, "Hi [drug customer] meet [Individual 2]. You can coordinate with him when he will be back at the crib. Thank you guys x"; "[drug customer] go get them oranges"; and "[Individual 2] is at the apt." Additionally on March 8, 2024, defendant texts another drug customer, "Kk I can do a ball 300 plus 40 Delivery fee" and "[Individual 2] will be around when I'm gone so if you need anything for the weekend let me know." (PSR ¶ 31.)

As set forth in the PSR, defendant also used her stash house to "cook" liquid ketamine to transform it into a powder version she also sold in volume.  (PSR ¶ 32.)

**C.    Defendant Sold Ketamine to Cody McLaury the Day He Died of a Drug Overdose**

As defendant admitted in her plea agreement, on August 26, 2019, defendant distributed ketamine to victim Cody McLaury[2] through Individual 1.  Specifically, in response to Mr. McLaury's text message requesting to travel to the North Hollywood residence to purchase ketamine, defendant confirmed she had ketamine to sell, stating, "I left [Individual 1] 4 . . . if u want them for 120 each take the 4."  Defendant also advised, "I have too much in inventory for now. I'll hook u up. Everyone else paying 140," and sent Mr. McLaury contact information for Individual 1.  Mr. McLaury then picked up 4 vials of ketamine from defendant's North Hollywood residence.  After receiving the drugs, Mr. McLaury sent an electronic payment of $480 to defendant on Venmo.

---

[2] The government confirmed with the victims' families, who did not object to the use of their names in this filing.

4

Mr. McLaury was found deceased inside his apartment from an apparent overdose on August 29, 2019.  (Ex. A at 1-6.)  LAPD reported that several of Mr. McLaury's friends shared that they had last heard from him on August 26, 2019 (id. at 4), the same day that defendant directed Individual 1 to sell ketamine to Mr. McLaury.  An autopsy report issued by the Los Angeles County Medical Examiner-Coroner's Office listed his cause of death as a mixed drug overdose that included acute ketamine toxicity.[3]  (Id. at 5.)

**D.    Defendant Continued to Sell Drugs After Being Warned That Her Drugs Contributed to Victim McLaury's Death**

After Cody McLaury passed away, a family member began to investigate his death, including by searching Mr. McLaury's cellular phone.  In doing so, the family member found texts showing defendant sold ketamine to Mr. McLaury on or around the day he died of an overdose.  After finding the texts, in May 2020, the family member used McLaury's cellular phone to send a message to defendant, writing, "The ketamine you sold [McLaury] killed him.  It's listed as the cause of death, FYI."  This message was recovered from a cell phone belonging to defendant, which was seized pursuant to a federal warrant, and metadata from her phone shows she received the message. (Ex. B.)  Metadata from defendant's phone also shows that after she received the message from Mr. McLaury's family member, defendant performed an internet search to confirm ketamine could cause death, querying: "can ketamine be listed as a cause of death"?  (Ex. C.)

---

[3] On November 13, 2019, the Coroner's Office completed a toxicology report showing that several drugs, including ketamine, were found in Mr. McLaury's blood.  (Ex. A at 31.)  There is no evidence linking defendant to the sale of the other drugs that contributed to Mr. McLaury's overdose death.

**E.   Defendant Worked With Co-Conspirator Fleming to Distribute Ketamine to Matthew Perry, Resulting in Mr. Perry's Death**

As defendant admitted in her plea agreement, in October 2023, defendant conspired with others, including Co-Conspirator Erik Fleming ("Co-Conspirator Fleming"), to knowingly and intentionally distribute ketamine to Matthew Perry.

Specifically, on October 11, 2023, defendant used the Signal messaging application to text Co-Conspirator Fleming that her ketamine was high quality, and offered to provide a sample bottle for Mr. Perry, stating: "It's unmarked but it's amazing – he take one and try it and I have more if he likes."  Co-conspirator Fleming then forwarded a screenshot of defendant's message to Co-conspirator Kenneth Iwamasa, Mr. Perry's personal assistant, and wrote: "[j]ust got this from my person. She only deal[s] with high end and celebs. If it were not great stuff she'd lose her business."

On October 12, 2023, Co-Conspirator Fleming called defendant using the Signal application to obtain a sample vial of ketamine and told defendant that the ketamine was intended for Mr. Perry.  That same day, Co-Conspirator Fleming texted Co-Conspirator Iwamasa that his "hook up," that is, defendant, "was able to get the kind that is used for intermuscular . . . . I guarantee it's going to be amazing." Defendant sent Co-Conspirator Fleming a photograph of her ketamine, which he then forwarded to Co-Conspirator Iwamasa to show him "what [the ketamine vials] look like."

On October 13, 2023, defendant met with Co-Conspirator Fleming at her North Hollywood stash house and sold him a ketamine vial for Mr. Perry.

**A.    Defendant and Co-Conspirator Fleming Sold 50 Additional Ketamine Vials to Mr. Perry**

On October 13, 2023, after conferring with defendant, Co-Conspirator Fleming texted Co-Conspirator Iwamasa that he could get as many vials of ketamine from defendant as Co-Conspirator Iwamasa wanted, stating: "Let me know how many . . . and I'll confirm what she can get. But as now she said she can fill any order." In response, Co-Conspirator Iwamasa advised he would purchase "25 vials $5500 @220 +500 for you for logistics."

On October 14, 2023, after picking up cash from Co-Conspirator Iwamasa, Co-Conspirator Fleming traveled to defendant's North Hollywood stash house and purchased 25 vials of ketamine from defendant to sell to Mr. Perry.  Co-Conspirator Fleming then delivered the ketamine to Co-Conspirator Iwamasa so Co-Conspirator Iwamasa could inject Mr. Perry with the ketamine.

On October 23, 2023, defendant again conferred with Co-Conspirator Fleming about her ketamine supply, including the availability of more ketamine to sell to Mr. Perry.  The following day, on October 24, 2023, after arranging the drug deal over the Signal application, Co-Conspirator Fleming traveled to defendant's North Hollywood residence, where defendant sold and accepted cash for 25 additional ketamine vials that defendant understood were intended to be used by Mr. Perry.  Because of the size of the purchase, defendant also included ketamine lollipops in the order.  Co-Conspirator Fleming delivered the drugs to Co-Conspirator Iwamasa later that day.

On October 25, 2023, defendant texted Co-Conspirator Fleming over Signal to coordinate additional drug sales to Mr. Perry, noting

that she would be traveling the following week: "Please let me know if u think there will be another round because the scientist he'll be gone as well . . .  I'll have to know ahead of time to get that sorted out before we leave."  The next day, Co-Conspirator Fleming texted Co-Conspirator Iwamasa, "How are you? I realized on next shipment we could probably get it packaged in fewer boxes instead or resale size."

Leading up to Mr. Perry's death on October 28, 2023, Co-Conspirator Iwamasa repeatedly injected Mr. Perry with the ketamine that defendant sold to Mr. Perry through Co-Conspirator Fleming. Specifically, on October 28, 2023, Co-Conspirator Iwamasa injected Mr. Perry with at least 3 shots of defendant's ketamine that he received from Co-Conspirator Fleming, which resulted in the death and serious bodily injury of Mr. Perry.

**B.    Defendant Directs Co-Conspirator Fleming to Delete Evidence After Learning About Mr. Perry's Death**

On October 28, 2023, after learning about Mr. Perry's death from news reports, defendant called Co-Conspirator Fleming on Signal to discuss how to distance themselves from Mr. Perry's death.  Among other things, defendant updated the settings on the Signal application to automatically delete her messages with Co-Conspirator Fleming and instructed him to "Delete all our messages."

On October 30, 2023, using Signal, Co-Conspirator Fleming left a voice message for defendant and texted: "Please call . . . Got more info and want to bounce ideas off you. I'm 90% sure everyone is protected.  I never dealt with [Mr. Perry]. Only his Assistant.  So the Assistant was the enabler. Also they are doing a 3 month tox

screening . . . Does K stay in your system or is it immediately flushed out[?]."

**III. SENTENCING GUIDELINES CALCULATION**

    **A.    The Government Agrees with the USPO's Calculations**

The government materially agrees with the USPO's Guidelines calculation, though the government believes the Court should apply a three-point reduction for acceptance of responsibility.[4]

Specifically, the government concurs with USPO's calculation of the total offense level as follows: a base offense level of 32, U.S.S.G. § 2D1.1(a)(5) & (c)(4); +2 for maintaining a stash house, U.S.S.G. § 2D1.1(b)(12); +2 for aggravating role, U.S.S.G. § 3B1.1(c); and +2 for obstruction, U.S.S.G. § 3C1.1.  After a three-level reduction for acceptance of responsibility, defendant's total offense level is 35.   Based on a total offense level of 35 and a criminal history category of I, defendant's Guidelines range is 168-210 months.

    **B.    The Court Should Overrule Defendant's Objections**

Defendant filed various objections to the above calculations. See Dkt. 101. For the following reasons, the Court should overrule the objections:

        1.    The Stash House Enhancement Applies (Def. Obj. 1)

Defendant argues that it is "double counting" to apply a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) because she has been convicted of the corresponding statute, 18 U.S.C. § 856, both of

---

[4] Based on substantial preparation for trial, the government initially objected to applying a third point for acceptance of responsibility under U.S.S.G. § 3E1.1(b).  The government no longer intends to assert this opposition, and thus respectfully requests that the Court apply a three-level reduction for acceptance of responsibility.

which criminalize the maintaining a drug involved premises.    Dkt. 101 at 2.

Not so.    Binding caselaw makes clear that Congress intended for the disputed enhancement to apply whenever a defendant operates or maintains a stash house, including cases like this where the defendant admitted such facts by pleading guilty to a violation of Section 856.    As the Ninth Circuit held in United States v. Tekola, by passing the Fair Sentencing Act "Congress directed the Sentencing Commission to provide for an enhancement if 'the defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in [21 U.S.C. § 856].'"    2026 WL 654548 (9th Cir. Mar. 9, 2026) (quoting Pub. L. No. 111-220, § 6(2)). Thus, contrary to defendant's claim, Congress itself thought the enhancement was "necessary" to capture the harm wrought by defendants who maintain a premises for their drug trafficking activities. Courts, including the Ninth Circuit, have upheld the enhancement where, as here, the defendant has been convicted under Section 856. See, e.g., United States v. Morales, 680 F. App'x 548, 552 (9th Cir. 2017) (no error applying enhancement where defendant was convicted for violating Section 856, among other drug-related statutes).    This Court should do the same.

2.    Defendant Played An Aggravating Role (Def. Obj. 2.)

Defendant should be assessed a two-level enhancement under § 3C1.1(c) for being an "organizer, leader, manager, or supervisor."

The PSR contains a wealth of evidence that defendant exercised decision-making authority over at least two co-conspirators, Individual 1 and Individual 2.    The PSR outlines how defendant recruited and directed her co-conspirators to work for her and deal

from the stash house in her absence, shows how defendant controlled all the details of the drug deals, including the price and quantity, and dictated where and how the drug transactions should happen (at defendant's stash house via a lockbox or a hand-to-hand transfer). For example:

- Defendant's phone contained numerous conversations where she "instructs [Individual 1] how to serve her clients in her absence as well as coordinates with her clients to meet with [Individual 2] to pick up drugs," (PSR § 29);

- Defendant directed Individual 1 on January 8, 2021 to leave drugs in a lockbox for a client: "Can u leave one in the lockbox for [client] the clear," (PSR ¶ 30);

- Defendant instructed Individual 1 on August 30, 2021 with the details of a prenegotiated deal for her to carry out, and that defendant will get payment from the client directly: "OK [client] will grab them from you tomorrow … … He taking all 20….360 total he owes…. We will just do it like this….He will send it digital to me.") Dkt. 83 at 32-38.

- Defendant orchestrated a deal in a group chat that would be carried out by Individual 2 in her absence: "Hi [client] meet [Individual 2]. You can coordinate with him when he will be back at the crib [referring to the stash house]," and just a few minutes later, "[Client] go get them oranges … [Individual 2] is at the crib," (PSR ¶ 31);

- Defendant explicitly stated that Individual 2 would be her alternate when she was absent from the stash house: "I can do a ball 300 plus 40 Delivery fee … My boyfriend will be

11

around when I'm gone so if you need anything for the weekend let me know." (PSR ¶ 31);

- Defendant instructed Individual 2 on the going price of her litany of drugs, when on April 29, 2023, she shared a note containing a price list of drugs for his further dissemination (PSR ¶ 32(iv)).

Thus, defendant's attempt to characterize her organizational and leadership role to that of mere "logistical coordination" should be rejected.[5]  Dkt. 101 at 3.

Indeed, defendant's leadership role in the ketamine distribution that contributed to Mr. McLaury's death highlights this point. Exhibit D, which contains text messages between defendant and Mr. McLaury, shows that defendant sold drugs to Mr. McLaury over the course of years.  During that time, defendant often instructed Individual 1 to sell ketamine to Mr. McLaury.  (See, e.g., Ex. D at 9 (texting Mr. McLaury that defendant was "leaving for the night" and "if u want me to leave anything with [Individual 1] my roomie she can give them to you this evening"; id. at 11, texting Mr. McLaury: "I'm in London now … I have a stash there what do you need ? I can connect you with [Individual 1] or my other guy tomorrow");).

In fact, as set forth above, defendant directed Individual 1 with respect to the ketamine dose that contributed to Mr. McLaury's

---

[5] Even if all defendant did was "coordination," that coordination would suffice to trigger the enhancement.  United States v. Doe, 778 F.3d 814, 823-24 (9th Cir. 2015) (holding that "the organizer enhancement is appropriately applied to defendants who coordinate drug transactions," and an organizer "need to be a supervisor or a superior in a hierarchy of criminal associates.").

death.  Critically, after determining how much product Individual 1 would give to Mr. McLaury, defendant had Mr. McLaury pay defendant --- not Individual 1 --- for the four vials of ketamine.  Defendant dictated the amount, quantity, and price of drugs Individual 1 would deal on her behalf, and defendant did not just collect a larger share of the fruits of the crime than Individual 1; she took all of it.

### 3.    Defendant Obstructed Justice (Def. Obj. 3.)

Defendant also attempts to skirt responsibility for her attempted obstruction of justice based on two technicalities.  Dkt. 101 at 4-5. Neither is availing.

Defendant objects that there was no "official investigation" or proceeding at the time that she began to obstruct justice on October 28 --- the day that Mr. Perry died.  This objection is factually incorrect.  The LAPD Robbery Homicide Division responded to Mr. Perry's residence on October 28 and began investigating the case. That same day, defendant instructed co-conspirator Fleming to "[d]elete all our messages" and otherwise conspired with Fleming to conceal their involvement in Mr. Perry's death.

But even if no investigation had begun (it had), the objection is still baseless because "obstructive conduct that occurred prior to the start of the investigation …  may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1, Application Note 1.  Defendant's attempted spoliation was exactly that.  Indeed, defendant's actions show that she suspected the drugs she had sold Mr. Perry may have caused his death, so she sought to destroy digital evidence that she and a co-conspirator possessed that would link them to the deadly drug deal.

13

Defendant also objects to the obstruction enhancement by claiming that her conduct did not actually destroy evidence or make it unavailable to investigators.  This argument, too, is wrong on the facts and the law.  Although co-conspirator Fleming was able to preserve *some* of the damning communications between him and defendant, the vast majority of their texts were lost due to defendant applying the automatic deletion function on the Signal application.  But even if no evidence was actually lost, the plain text of the enhancement applies to both completed and attempted obstruction of justice. U.S.S.G. § 3C1.1 (applying where the defendant "willfully obstructed or impeded, or <u>attempted</u> to obstruct or impede." (emphasis added)).  Because the defendant obstructed and attempted to obstruct justice, the two-level enhancement under U.S.S.G. § 3C1.1 applies.

                    4.    <u>Defendant Is Not a Zero Point Offender Because Her Offense Conduct Caused Death and She Was a Leader/Organizer of the Drug Trafficking Scheme (Def. Obj. 6.)</u>

Defendant asks the Court to direct the USPO to modify the PSR to state that the "only reason Ms. Sangha does not receive the § 4C1.1 reduction is the death-resulting element of Count 13."  Dkt. 101 at 8.  The request is frivolous and should be denied.

Defendant has at least <u>two</u> disqualifying characteristics that bar application of the Zero Point Offender reduction: (1) her offense conduct caused serious bodily injury and death; <u>and</u> (2) she had an aggravating role in the offense, <u>see</u> 4C1.1(a)(4) & (10).  And, contrary to her objections, it is not just her conduct on Count 13, the death-resulting count, that disqualifies her from being a Zero

Point Offender --- defendant is also disqualified on the basis of her other offense conduct, including Count 2, the stash house count.  As detailed above, defendant had an aggravated role over co-conspirators with respect to her orchestration of drug sales from the stash house, and is additionally ineligible for relief on that basis.

Even if defendant was only disqualified on the basis of just one offense, for example, Count 13, that would still preclude her from getting Zero Point Offender relief as to her overall sentence. See, e.g., United States v. Kealoha, 2024 WL 1202377, at *4 (D. Haw. Mar. 19, 2024) (defendant's receipt of an aggravated role adjustment for only one set of offenses and not another nonetheless disqualifies him for the zero point reduction as to his sentence for all offenses).

**IV.  A 180-MONTH SENTENCE IS JUST AND APPROPRIATE GIVEN THE AGGRAVATING CIRCUMSTANCES IN THIS CASE**

For the reasons set forth below, the government recommends that the Court sentence defendant to: (i) 180 months' imprisonment; (ii) followed by three years' supervised release; and (iii) a mandatory special assessment of $500.  Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A.  Defendant Trafficked Drugs In Bulk for Many Years and Used Others to Help Facilitate her Trafficking**

The extensive nature of defendant's drug trafficking requires a significant custodial sentence.  For many years, defendant sold an array of illegal drugs -- including cocaine, ketamine (in multiple forms), MDMA, LSD, counterfeit Xanax, methamphetamine pills, and various powders containing a cocktail of drugs. (See, e.g., Dkt. 83 at 20, 24.) Defendants own text messages show she knew her drugs were

15

potent, prompting her to warn a customer "I think you'll like these, but remember they're double strength." (PSR ¶ 9 at 32(iv)).

The scope of defendant's drug trafficking business is also clear from the volume of drugs she purchased from her drug suppliers at any given time. For example, in a text exchange with a supplier in August 2020, defendant purchased 150 bottles of ketamine. (PSR ¶ 32 (i)). Since defendant generally resold ketamine bottles for $120-$180 per bottle, this single purchase represents $18,000-$27,000 of drug proceeds for defendant. An pay/owe reconciliation text defendant previously sent to the same dealer showed that she had purchased over $12,800 worth of drugs to resell on another occasion. (PSR ¶ 32(ii)).

Indeed, defendant had such a steady and willing stream of drug sales that she brought in co-conspirators -- Individual 1 and Individual 2 -- to sell her drugs. Defendant ran a tight ship, orchestrating when, where, and for how much her co-conspirators could dispose of her drugs. Defendant's drug trafficking was as well-practiced as it was brazen: during COVID-19, defendant instituted a contactless pickup system that allowed clients to pick up drugs from a lockbox outside of the North Hollywood stash house to facilitate her sales. She boasted of how much product she had at her disposal --- referring to herself as the "pharmacy." (Dkt. 83 at 24.)

**B.  Defendant repeatedly sold drugs after learning she contributed to at least two deaths**

Defendant repeatedly sold dangerous drugs for many years, even after learning that the drugs she sold were dangerous and deadly. In 2020 --- at the latest --- defendant learned she sold ketamine that contributed to Mr. McLaury's death. She didn't care and kept

16

selling.  In 2023, defendant learned she sold the drugs that caused Mr. Perry's death and her reaction was the same: she didn't care and kept selling.  Defendant's actions show a cold callousness and disregard for life.  She chose profits over people, and her actions have caused immense pain to the victims' families and loved ones.  That defendant had the opportunity to stop after realizing the impact of her dealing --- but simply chose not to, warrants a significant, within-Guidelines sentence.

### C.   Defendant's Criminal History Category Fails to Account for Her History of Crime

Defendant's criminal history and Guidelines range significantly underrepresents the long and prolific arc of her drug dealing --- and the significant harm she caused along the way.

Defendant's offense level is driven by the weight of drugs that law enforcement seized from her stash house on just one day in March 2024.[6]  However, as described above, defendant had been dealing drugs in volume for years and her drug dealing has contributed to at least two deaths.  Despite defendant's extensive career in drug trafficking, she was able to evade law enforcement detection and thus has no prior convictions documenting her criminal history.  As a result, defendant's Guidelines range significantly undercounts the true scope of her criminal conduct.  As such, the Court should impose a midpoint-Guidelines sentence of 180 months and deny any downward variances.

---

[6] Although defendant was convicted of a death-resulting count, because ketamine is a schedule III drug, the Guidelines prescribe only a base offense level of 26 for causing Mr. Perry's death --- not the 20-year mandatory minimum that would apply if the drug in question was a Schedule I or II controlled substance.

17

**D.    Defendant Sold Drugs for Greed and Notoriety**

Also appalling --- and relevant to defendant's history and characteristics --- is that defendant appears to have dealt drugs not due to financial distress or necessity, but for greed and notoriety.

Defendant is a privileged individual.  She had a "stable and positive" upbringing with a mother and stepfather that owned multiple businesses and her life was "financially stable."  (PSR ¶ 87-88.) Growing up, defendant summered in London with her grandparents. (Id.)  She attended a well-respected university, studied abroad in England and China, and even earned a master's degree. (PSR ¶ 92, 111-113.)  Defendant spent extravagantly: she drove a Range rover (PSR ¶ 125) and had racked up $80-100k in credit card debt. (PSR ¶ 124.) And she continues to receive familial support, including her family paying for her retained counsel in this case.  (PSR ¶ 126.)

Defendant, however, elected not to make use of her privileged background for the better.  In fact, unlike many defendants who traffic drugs against a humble backdrop marred by childhood and family difficulties, defendant chose to deal drugs not because of financial deprivation, but for greed, glamor, and access.  Defendant boasted about how her clients included "red carpet motherfuckers," and "a very very VIP circle of celebs and vip friends." (PSR ¶ 32). She held herself out as a celebrity dealer to co-conspirator Fleming as well, who touted defendant as someone who "only deal[s] with high end and celebs."  These facts further contribute to the aggravating circumstances of this case, and therefore justify the government's recommended sentence of 180-months' custody.

18

**E.    A Significant Term of Imprisonment Is Necessary to Provide Just Punishment and Avoid Sentencing Disparities**

Sentencing defendant to a midpoint Guidelines sentence is just punishment for her crimes and will avoid sentencing disparities with similarly situated individuals.  A defendant who, like defendant, trafficked more than 1.5 kilograms of methamphetamine, operated a stash house, was a leader/organizer over other co-conspirators, and obstructed justice will expect to receive a Guidelines sentence, as they should.

The government's proposed sentence also accurately accounts for defendant's uniquely aggravating circumstances: unlike any other co-conspirators in this case, only defendant repeatedly sold drugs for years; only defendant sold drugs that contributed to at least two overdose deaths; only defendant was on notice that her ketamine was tied to two overdoses, but continued to sell her dangerous drugs; and only defendant operated a stash house with multiple pounds of methamphetamine pills alongside a panoply of other drugs.  The government respectfully submits that a sentence of 180-months is just, appropriate, and necessary to adequately accounts for defendant's crimes and to otherwise satisfy Section 3553(a).

**V. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 180 months' imprisonment; (ii) followed by 3 years' supervised release; and (iii) a mandatory special assessment of $500.

19